

**SIGNED this 29 day of February, 2008.**

                                                        _____
                                                        **Marcia Phillips Parsons**
                                                    **UNITED STATES BANKRUPTCY JUDGE**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| In re | |
| EMERGYSTAT OF SULLIGENT, INC., | No. 07-51394 |
| | Chapter 11 |
| Debtor. | |

## M E M O R A N D U M

APPEARANCES:

| | |
|---|---|
| TERRY RISNER, ESQ.<br>534 West Main Street<br>Mt. Carmel, Tennessee 37645<br>*Attorney for Emergystat of Sulligent, Inc.* | PATRICIA FOSTER, ESQ.<br>800 Market Street, Suite 114<br>Knoxville, Tennessee 37902<br>*Attorney for United States Trustee* |
| J. GREGORY BOWMAN, ESQ.<br>220 W. Depot Street, Suite 423<br>Greeneville, Tennessee 37743<br>*Assistant United States Attorney* | DENNIS O'DEA, ESQ.<br>1800 The Carillon<br>Charlotte, North Carolina 28270<br>*Attorney for Southland Health Services, Inc.* |
| MATTHEW H. WIMBERLEY, ESQ.<br>Post Office Box 3740<br>Kingsport, Tennessee 37664<br>*Attorney for General Electric Capital Corp.* | |

**MARCIA PHILLIPS PARSONS, United States Bankruptcy Judge**. This chapter 11 case is before the court on the motion to dismiss or convert filed January 18, 2008, as amended on February 12, 2008, by the United States of America on behalf of the Internal Revenue Service. The United States asserts that cause exists for dismissal under 11 U.S.C. § 1112(b) and that dismissal is in the best interests of creditors and the estate. As cause, the United States cites: (1) continuing loss to or diminution of the estate and the absence of a reasonable likelihood of reorganization under 11 U.S.C. § 1112(b)(4)(A); (2) gross mismanagement of the estate pursuant to 11 U.S.C. § 1112(b)(4)(B); (3) failure to comply with court orders under 11 U.S.C. § 1112(b)(4)(E); (4) unexcused failure to satisfy timely filing and reporting requirements under 11 U.S.C. § 1112(b)(4)(F); and (5) failure to timely pay taxes owed after the date of the order for relief and to file postpetition tax returns under 11 U.S.C. § 1112(b)(4)(I). In support of the statutory bases for dismissal, the United States references, *inter alia*, the Debtor's cessation of business operations, the Debtor's failure to file monthly operating reports, the Debtor's failure postpetition to file federal tax returns and make required payroll tax deposits, and the Debtor's failure to file a plan of reorganization by the expiration of the Debtor's exclusivity period on February 1, 2008.

The United States' motion to dismiss is supported by the United States trustee and General Electric Capital Corporation ("GE Capital"), a secured creditor of the Debtor. The motion is opposed by the Debtor and Southland Health Services, Inc. ("Southland"), the parent company of the Debtor. A hearing on the matter was held on February 15, 2008, with the only witnesses being Constance Little, bankruptcy specialist for the IRS, and Larry Lunan, president and CEO of both the Debtor and Southland. For the reasons discussed below, the motion to dismiss will be granted and this chapter 11 case dismissed. This is a core proceeding. See 28 U.S.C. § 157(b)(2)(A).

I.

A recitation of the procedural history of this case is helpful. At the time of this chapter 11 bankruptcy filing on October 4, 2007, the debtor Emergystat of Sulligent, Inc. was in the business of providing ambulance services in a six-county area of the state of Alabama. According to its schedules, the Debtor has no real property and limited personalty, consisting entirely of 18 ambulances with a total value of $180,000; accounts receivable in the amount of $911,543.68; and

a note receivable from Johnny Glenn Crawford in the amount of $5,436,940. On the other hand, its debts are substantial. Schedule D lists a debt owed to GE Capital for $1.9 million, secured by the Debtor's accounts receivable; Schedule E indicates a debt of almost $10 million to the IRS for unpaid payroll taxes; and Schedule F lists unsecured debt totaling almost $100,000. The IRS has filed a proof of claim in excess of $17.3 million, secured in part by notices of tax lien filed prepetition. GE Capital's proof of claim indicates that as of January 25, 2008, it was owed "$ at least 2,345,000.00."

On October 17, 2007, almost two weeks after filing its bankruptcy petition, the Debtor filed a motion to use cash collateral, stating that GE Capital and the IRS allege a security interest in the Debtor's accounts receivable, and that the Debtor needed to use the proceeds of these accounts to operate its ambulance service business. According to the motion, prior to the petition date the IRS had issued notices of levy to virtually all of the Debtor's customers, causing the Debtor's cash to dry up, and the IRS had not released these levies postpetition or otherwise consented to the use of the cash collateral. At a preliminary hearing on the motion held on October 23, 2007, the Debtor alleged that the IRS levies had caused a hold on sums totaling $400,000 owed to it and sought the release of those funds. The Debtor revealed at the hearing that it had been receiving unauthorized loans from Southland in order to meet expenses, and that it had been using cash collateral without court approval or the consent of the IRS and GE Capital since its bankruptcy filing. After a continued hearing to October 25, 2007, the Debtor, the IRS, and GE Capital reached an agreement authorizing the Debtor's use of cash collateral until November 7, 2007, as set forth in an agreed order entered October 29, 2007.

Under the terms of this order, the IRS agreed to release its prepetition levies and the Debtor agreed to pay the IRS a weekly adequate protection payment of $25,000. The IRS and GE Capital were granted replacement liens in the postpetition accounts receivable generated by the Debtor, with the Debtor to provide weekly financial reports, file all delinquent federal tax returns, timely file all postpetition federal tax returns, and timely deposit postpetition payroll taxes. Southland agreed to subordinate its postpetition loans to the Debtor, totaling $393,207, to the payment of all other claims against the Debtor. The agreed order authorized the Debtor to use cash collateral only to pay the direct postpetition expenses necessary to operate its 18 ambulances, with no funds being transferred

to affiliates or insiders of the Debtor, including Southland and Larry Lunan.

On November 21, 2007, the court entered a second order authorizing the Debtor's use of cash collateral, notwithstanding the IRS's objection to the Debtor's continued use of its collateral, premised on the Debtor's failure to make the required adequate protection payments. The Debtor asserted that its inability to make the payments was due to the IRS not having fully released its levies, although this assertion was disputed by the IRS. The court's order essentially maintained the status quo as to the Debtor's use of cash collateral, as did the third interim cash collateral order, entered by the court on December 6, 2007, which authorized the use of cash collateral until December 18, 2007.

On December 11, 2007, the Debtor filed a second motion for the use of cash collateral, scheduling an emergency hearing on December 17, 2007. The Debtor requested in the motion that it be allowed to use cash collateral without making adequate protection payments to the IRS, despite its previous agreement to make such payments, and that it be permitted to make certain monthly payments to Southland for the Debtor's overhead expenses. The motion was opposed by both IRS and GE Capital.

At the December 17, 2007 hearing, the Debtor represented that its total monthly expenses averaged $302,440, including $95,000 to Southland for necessary overhead expenses. As explained at the hearing by Dudley Bell, the controller for Southland, and Larry Lunan, Southland is the parent company of five wholly-owned subsidiaries, one of which is the Debtor (collectively, the "Southland entities"). The Southland entities all operate ambulances services in 200 communities in five different states, with Mr. Lunan as the head, not only of Southland, but also of each of the Southland entities. Each of the Southland entities pays for its own direct costs, such as payroll for its EMT personnel, rent, utilities, fuel, office expenses, and supplies, but the parent company Southland provides all the management, accounting, dispatching, insurance, and marketing services for the Southland entities. Southland's entire costs of operations are then split among the Southland entities based on the 24-hour equivalent ambulances that operate. According to Mr. Lunan, the Southland entities operate a total of 80 ambulances; the Debtor operates eight of these ambulances, so the

4

Debtor's share of these expenses is 10.9%.[1]  Messrs Bell and Lunan admitted that there was no written contract between the Debtor and Southland that governed this arrangement, and that the only way to verify that the Debtor was paying its proportionate share would be through examining the books and records of Southland and the other Southland entities, which records had not been provided.  The witnesses maintained, however, that this allocation was historically consistent and that it was cost effective based on economies of scale.  They conceded that no effort had been made by the Debtor to determine whether the services provided by Southland were obtainable elsewhere at a more economical price.  Mr. Lunan testified that it was essential that the Debtor pay Southland for these services and that absent payment, Southland could refuse to provide these services to the Debtor.

The evidence presented at the December 17, 2007 hearing also revealed that while the Debtor's current revenues are deposited in a debtor-in-possession account, prior to the bankruptcy filing all of the income of the Southland entities, including the Debtor's, was collected by Southland, which also made the management decisions as to which debts of the Southland entities to pay.[2]  Morever, prior to the Debtor's bankruptcy filing, all of Southland's employees, along with all of the employees of the other Southland entities, were considered employees of the Debtor that were then "leased" to Southland and the Southland entities.  All the employees of all the Southland entities and Southland were paid by the Debtor as its employees and the Debtor was responsible for paying the payroll taxes of all employees, although the funds used by the Debtor to make payroll and pay the taxes were to be provided to the Debtor from Southland by the entity to whom the employees were leased.  This system failed prepetition when Southland, because of attachments by its creditors, failed to pay the required payroll taxes to the IRS on behalf of the Debtor.  Thus, the Debtor's large tax liability is for payroll taxes on employees, the majority of which, were the employees of the

---

[1] No explanation was provided as to why this figure was not simply 10%.

[2] Mr. Lunan elaborated on Southland's practices at the February 15, 2008 hearing.  He stated that on a daily basis Southland collects and deposits all of the revenues received by all of the Southland entities that day into one bank account (although each entity is given credit), and that Southland uses the collected revenue to meet the particular cash demands of the various Southland entities that day.  In other words, internal loans between the Southland entities take place on a daily basis in order to meet cash demands of each entity, with monthly reckonings.

5

Debtor in name only and were in reality, employees of Southland and the Southland entities. Mr. Bell testified that the transition of changing the employees from the Debtor to their actual employer began in the spring of 2007 but was not completed until immediately prior to the Debtor's bankruptcy filing.

At the time of the December 17, 2007 hearing, the Debtor had made only one adequate protection payment to the IRS. And, despite the Debtor's contention that the IRS's prepetition levies had prevented almost $400,000 being paid to the Debtor, upon the release of the levies no such funds were forthcoming, and the IRS only recovered some $40,000 from the levies, which by agreement with the Debtor it applied to the Debtor's postpetition obligations.

At the conclusion of the December 17, 2007 hearing, this court denied the Debtor's motion for the use of cash collateral under the terms proposed by the Debtor, concluding that it had failed to establish that the security interests of the IRS and GE Capital would be adequately protected. While the evidence indicated that the Debtor had continued to generate accounts receivable postpetition, no evidence was presented establishing that the Debtor had sufficient contracts to continue to generate the accounts receivables in the future. The Debtor failed to produced any financial reports indicating how the Debtor's financial condition had changed overall from the date of filing to the hearing date or any projections indicating the Debtor's future expectations. Additionally, the weekly reports submitted to the IRS and GE Capital pursuant to the cash collateral orders lacked the specificity required by the orders and the transparency necessary for a chapter 11 debtor.[3]

As to the proposed payments to Southland, this court concluded that the Debtor had failed to demonstrate that the charges were reasonable and that they did not exceed what the Debtor would pay if the services were performed by an unrelated third party. The court concluded that such proof was warranted due to the fact that Southland's management of the Debtor, specifically the decision for the Debtor to act as employer of all of the employees of the Southland entities, without ensuring

---

[3] For instance, one postpetition check written by the Debtor was to the Bank of Vernon for "fuel, repairs, and health insurance charges for November."

6

that the Debtor had the necessary funds to pay the required payroll taxes, had led to the Debtor's huge IRS obligations and resulting bankruptcy filing. Moreover, because Southland received in the first instance all of the Debtor's income prepetition and made all of the decisions as to which obligations of the Debtor to pay, this court was unwilling to permit the Debtor to pay a third of its monthly postpetition income to Southland, absent full disclosure of all of the Debtor's prepetition transactions with Southland and the other Southland entities.

Subsequently, on December 18, 2007, GE Capital filed a motion to condition the Debtor's use of cash collateral pursuant to 11 U.S.C. § 363(e) and Federal Rule of Bankruptcy Procedure 4001(a). After an emergency hearing on December 20, 2007, this court entered an order on December 21, 1007, authorizing and conditioning the Debtor's use of cash collateral until January 17, 2008, subject to the terms set forth in the order, which were essentially the same terms set forth in the previous cash collateral orders, including the prohibition on payments to insiders or affiliates of the Debtor. Upon the expiration of this cash collateral order on January 17, 2008, the United States filed its motion to dismiss that is presently before the court.

II.

The United States is seeking dismissal of this case pursuant to § 1112(b) which was recently redrafted by Congress as part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, 119 Stat. 23 (2005) ("BAPCPA"). Section 1112(b)(1) and (2) now provides:

> (1) Except as provided in paragraph (2) of this subsection, subsection (c) of this section, and section 1104(a)(3), on request of a party in interest, and after notice and a hearing, absent unusual circumstances specifically identified by the court that establish that the requested conversion or dismissal is not in the best interests of creditors and the estate, the court *shall* convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, if the movant establishes cause. (Emphasis added).
>
> (2) The relief provided in paragraph (1) shall not be granted absent unusual circumstances specifically identified by the court that establish that such relief is not in the best interests of creditors and the estate, if the debtor or another party in interest objects and establishes that–
>     (A) there is a reasonable likelihood that a plan will be confirmed within the time frames established in sections 1121(e) and 1129(e) of this title, or if

>such sections do not apply, within a reasonable period of time; and (B) the grounds for granting such relief include an act or omission of the debtor other than under paragraph (4)(A)–
>>(i) for which there exists a reasonable justification for the act or omission; and
>>(ii) that will be cured within a reasonable period of time fixed by the court.

As explained by the bankruptcy court in *In re Gateway Access Solutions, Inc.*, 374 B.R. 556 (Bankr. M.D. Pa. 2007):

>Prior to the 2005 BAPCPA amendments, this subsection of the Bankruptcy Code provided, in part that:
>>. . . the court *may* convert a case under this chapter to a case under chapter 7 of this title or *may* dismiss a case, whichever is in the best interest of creditors and the estate for cause, including . . . (Emphasis added) 11 U.S.C. § 1112(b) (prior to 2005 amendments).
>
>Thus, the statutory language has been changed from permissive to mandatory. The amendments to § 1112 limit the Court's discretion to refuse to dismiss or convert a Chapter 11 case upon a finding of cause.

*Id.* at 560 (citations omitted).

Accordingly, under the terms of the statute, a court must dismiss or convert a chapter 11 case upon the establishment of cause unless, subject to certain exceptions inapplicable here, "unusual circumstances [are] specifically identified . . . that establish that the requested dismissal conversion is not in the best interests of creditors and the estate . . . ." 11 U.S.C. § 1112(b). As it existed pre-BAPCPA, § 1112(b) listed ten illustrative examples of "cause" for a chapter 11 case to either be dismissed or converted to chapter 7 liquidation, while BAPCPA now sets forth sixteen illustrative examples of "cause." *In re Gateway Access Solutions, Inc.*, 374 B.R. at 560. The United States asserts that five bases for cause under 11 U.S.C. § 1112(b)(4) exist in the present case:

>(A) substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation;
>
>(B) gross mismanagement of the estate;
>
>. . . .
>
>(E) failure to comply with an order of the court;
>
>(F) unexcused failure to satisfy timely any filing or reporting requirement established by this title or by any rule applicable to a case under this chapter;

. . . .

(I) failure timely to pay taxes owed after the date of the order for relief or to file tax returns due after the date of the order for relief[.]

Pursuant to § 1112(b)(1), the initial burden lies with the movant to establish "cause" for conversion. *See* 11 U.S.C. § 1112(b)(1). If the movant establishes "cause," then the burden shifts to the debtor or other party in interest to prove that the case falls within the § 1112(b)(2) "unusual circumstances" exception to § 1112(b)(1)'s mandatory conversion or dismissal. *See In re Gateway Access Solutions, Inc.*, 374 B.R. at 560. As set forth in the legislative history to the provision, the exception only applies if: "(1) the debtor or a party in interest objects and establishes that there is a reasonable likelihood that a plan will be confirmed within the time periods set forth in section 1121(e) and 1129(e), or if these provisions are inapplicable, within a reasonable period of time; (2) the grounds for granting such relief include an act or omission of the debtor for which there exists a reasonable justification for such act or omission; and (3) such act or omission will be cured within a reasonable period of time." *Id.* (quoting H. R. Rep. No. 109-31(I), 109th Cong., 1st Sess. 94 (2005), *reprinted in* 2005 U.S.C.C.A.N. 88, 159).

### III.

The evidence presented at the hearing in this matter on February 15, 2008, established that the Debtor voluntarily ceased operations at 5:00 p.m. on December 18, 2007, at the direction of Larry Lunan. Prior to the shut-down, the Debtor was operating nine ambulances with six employees per ambulance in six Alabama counties. However, beginning at the precise time that the Debtor ceased operations, Extended Emergency Medical Services, Inc. ("EEMS"), a Southland subsidiary that had been dormant for a year, took over the Debtor's ambulance services operations in the Alabama counties previously covered by the Debtor; the Debtor's EMT employees became EEMS's employees; the ambulances previously utilized by Debtor began to be used by EEMS; and EEMS operated under the same contracts under which the Debtor had previously provided services, billing the customers in EEMS's name rather than that of the Debtor and retaining the collected revenue. EEMS even began collecting for its own benefit the subsidy contractually promised to the Debtor by Perry County, Alabama. All of this took place without court or creditor approval or knowledge.

In fact, certain creditors of this estate only learned about the Debtor's cessation of business from the SEC filings and press releases of Southland, a publicly traded corporation. Moreover, EEMS began paying Southland for the "overhead expenses" that the court had refused to authorize the Debtor to pay.

On January 23, 2008, however, the operations of Southland and the Southland entities were all shut down when the entities lost their professional liability insurance as Southland failed to pay a $183,000 insurance premium due to Medicaid's three-week delay in mailing checks to three of the Southland entities. Although Southland was able to reobtain insurance in eight days (with the exception of insurance in the state of Mississippi), many of the hospitals and counties for whom Southland entities had provided ambulance services began using the services of Southland's competitors. Additionally, some of the Southland entities' employees went to work for their competitors, including all of the Debtor's former employees. At the time of the hearing, EEMS was only operating two ambulances in one county in which the Debtor had previously operated and Mr. Lunan testified that county was the only county for which the Debtor had a firm commitment for the future, although Mr. Lunan stated that he was in the process of attempting to obtain more contracts. He noted that Southland went from 83 equivalency ambulances prior to the global shutdown, then to zero, that the previous week Southland entities had operated five ambulances, and now there were eleven in operation.

Mr. Lunan testified that his long-term goals of the Debtor were to remedy the deficiency with the IRS, pay off GE Capital, and move forward with the company. He stated that the insurance disaster in January had put them behind, but that was not insurmountable, and that the demand for their ambulance services existed. He testified that he expected to quickly recover one-half of the revenue base and opined that the Debtor has a good chance within a couple of months of getting up to monthly revenue of $300,000 to $400,000 which will require nine ambulances with 50 employees. Mr. Lunan opined that in a short time the Debtor would be able to evaluate its possibilities of reorganization and present a plan that would provide more for creditors than dissolution would. Mr. Lunan also indicated that he was investigating new financing for Southland and that while there had been expressions of interest, he did not have a firm commitment at this time.

Mr. Lunan testified that none of the ambulances listed on the Debtor's schedules had been actually owned by the Debtor, rather they had been owned by Southland and leased to the Debtor. As to the $5 million dollar note receivable from Johnny Crawford listed in the Debtor's schedules, Mr. Lunan reported that Mr. Crawford had recently filed for bankruptcy relief under chapter 11 in Alabama, but he had not listed the Debtor as a creditor, and the Debtor has not filed a proof of claim in the case.

Mr. Lunan testified that the majority of Southland employees, about 50 (prior to the global shutdown there were 100), operate out of a 16,000 square foot building owned by Mr. Crawford in Vernon, Alabama. This building is where Southland employees provide management, accounting and human resources services for the Southland entities. Southland pays no rent for this building; instead, the $110,000 to $120,000 annual lease payments (between $9,000 and $10,000 per month) are offset against the note owed by Mr. Crawford to the Debtor. Nonetheless, the Debtor gets no credit for this offset. To the contrary, Southland passes on this rent expense to the Southland entities as if it were actually making the payments. In other words, Southland bills the Debtor for 10.9% of its nonexistent rent costs, even though the building is being provided through, at a minimum, a $9,000 monthly reduction of one of the Debtor's few assets, its promissory note from Mr. Crawford.

The December 2007 monthly operating report has not been filed, although Mr. Lunan testified that it had been forwarded to counsel. The January 2008 report also has not been filed but it was not due until February 16, 2008, the day after the hearing. Mr. Lunan testified that it was his understanding that the Debtor's 4th Quarter 2007 federal payroll tax return had been filed. Mr. Lunan indicated that he did not know if EEMS was making its payroll tax deposits.

The Debtor's weekly cash activity reports from January 19, 2008, to February 8, 2008, only indicated cash collections totaling $552. Mr. Lunan testified that no funds were available to collect the Debtor's accounts receivable after the Debtor ceased operations, but collections resumed after they found out that it was "detrimental to our customer base not to post receivables." Mr. Lunan acknowledged that neither of the two collection agencies previously utilized by the Debtor to collect delinquent accounts receivable was being used currently by the Debtor.

Constance Little testified that the Debtor had not filed either its 3rd Quarter 2007 or its 4th

11

Quarter 2007 federal payroll tax returns. She stated that the IRS records indicate that the Debtor has made some tax deposits but absent the filing of the returns, she was unable to determine whether all required deposits had been made. Ms. Little also testified that it did not appear that EEMS had made any payroll tax deposits.

Based on the entire record in this case, the court concludes that the United States has established cause for dismissal under 11 U.S.C. § 1112(b)(4)(A), "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation." With regard to the latter requirement first, the absence of a reasonable likelihood of rehabilitation has been demonstrated. The Debtor is not currently operating any ambulances and it has no employees. Accordingly to Mr. Lunan, the Debtor only has a contract in one county, and that business is now being provided by one of the other Southland entities. Notwithstanding Mr. Lunan's optimism that the Debtor can be up and running nine ambulances in two months with 50 employees, the court is not persuaded. The Debtor's employees have gone to work for its competitors, and given the financial problems of Southland and the Debtor, along with the loss of business experienced by all of the Southland entities, the court believes it unlikely that the Debtor will be able to quickly rehire that number of experienced personnel in a such a short period of time. Similarly, the court finds questionable Mr. Lunan's assertion that the Debtor will be able to quickly recover its customer base in light of the prior disruption in services by Debtor and the other Southland entities. Mr. Lunan described being chastised at a Unicoi County meeting and stated that there was considerable unhappiness among its customers because of the emergency created by its loss of insurance.

Moreover, the Debtor's debts are great, and its obligations small in comparison. Currently, the Debtor's only assets are $250,000 in cash, $1 million in accounts receivable, and a questionable note receivable, the maker of which is himself in bankruptcy. All of the Debtor's assets are security for the obligations to GE Capital and the IRS, who are collectively owed almost $20 million. The court is unable to envision the terms of a plan of reorganization that would permit the Debtor to make any dent in these obligations. No plan has been proposed, notwithstanding expiration of the Debtor's exclusivity period, and no evidence was presented to the court, in the form of projections or otherwise, as to the profit the Debtor's business operations can generate, even in the time the Debtor has been under bankruptcy protection.

Additionally, the United States has established "substantial or continuing loss to or diminution of the estate." The Debtor's management has permitted the subsidy from Perry County that contractually belongs to the Debtor to be paid to EEMS, one of the Debtor's affiliates. Management also stopped collecting the Debtor's accounts receivable for a time, stating that there were no funds available to finance collection efforts, even though the Debtor had $250,000 in cash. Further, the Debtor is experiencing a $9,000 monthly loss in the value of its Crawford note receivable because the value of this asset is going to Southland in the form of rental space. Lastly, although not quantifiable, the court must observe in this regard that the Debtor's management has shut down the Debtor's business operations and permitted its contracts and business to be taken over by a sister corporation. To this court, these unauthorized actions represent the epitome of "substantial loss to the estate."

Based on these same facts, the court also concludes that the United States has established cause for dismissal due to gross mismanagement of the estate under 11 U.S.C. § 1112(b)(4)(B). At a minimum, Mr. Lunan's actions in placing the interests of Southland over those of the Debtor constitute gross mismanagement.

Additionally, these facts are cause for dismissal under 11 U.S.C. § 1112(b)(4)(E) for "failure to comply with an order of the court." Management's actions in completing turning the business of the Debtor over to an affiliate can only be seen as a deliberate attempt by Mr. Lunan to circumvent this court's cash collateral orders, which, *inter alia*, expressly prohibited payment to Southland.

Lastly, the United States has proven cause under 11 U.S.C. § 1112(b)(4)( F) and (I) due to the Debtor's failure to file its December monthly operating report and its 2007 3rd and 4th quarter 941 returns. The Debtor offered no justification or excuse for these failures.

The United States having established statutory cause for dismissal, this court must then examine whether unusual circumstances have been identified that establish that dismissal is not in the best interests of creditors and the estate. This court concludes that no such unusual circumstances have been demonstrated. There is no reasonable likelihood that a plan will be confirmed within a reasonable period of time. The Debtor does not have enough assets to satisfy

secured and priority creditors, much less unsecured creditors,[4] and the Debtor has offered nothing other than speculation as to how creditors would be paid if the Debtor were permitted to remain in chapter 11. And, the IRS and GE Capital are at risk from the continuing loss of their collateral under the Debtor's current management. As to the best interests of the Debtor itself, the court can only observe that it was the Debtor that chose to unilaterally shut down its operations and turn over its entire business to another corporation. It is only just that the Debtor live with the consequences of its decision.

## IV.

The court will enter an order in accordance with this memorandum opinion granting the motion of the United States to dismiss.

---

[4] Under 11 U.S.C. § 1112(b)(1), this court must determine whether dismissal or conversion is in the best interests of creditors and the estate. The IRS sought dismissal rather than conversion, and both GE Capital and the United States trustee agreed that dismissal was in the best interests of creditors and the estate. Because there was no indication from any of the evidence that there were any assets that would be available to unsecured creditors in the event of a conversion, this court agrees.